IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : |
| | :   Case No.: 7:23-CR-3 (WLS-TQL) |
| | : |
| ROGER BERNARD PALMORE, JR., | : |
| | : |
| Defendant. | : |
| | : |

## ORDER

Before the Court is Defendant Palmore's Motion to Suppress. (Doc. 21). Therein, Defendant requests the Court to "suppress all evidence, statements, and observations that were obtained as the result of the warrantless search of 123 Washington Street, Sparks, GA, as well as any fruits of that illegal search." (*Id.* at 1). For reasons stated below, Defendant's Motion (Doc. 21) is **DENIED**.

## RELEVANT PROCEDURAL HISTORY

### I.   First Palmore Case, 7:21-CR-52

Previously, in the first iteration of this matter, *United States v. Palmore*, 7:21-CR-52-WLS-TQL-1 ("First Palmore Case"), Defendant had filed a Motion to Suppress based on the same facts as the instant case. (First Palmore Case, Doc. 20). After a hearing on the Motion, the Court denied Defendant's Motion. (First Palmore Case, Doc. 33). In making its ruling, the Court found that the Government failed to prove Defendant gave consent to the officers to search the Sparks house but that the officers nevertheless had reasonable suspicion to search. (*Id.* at 8–10). This is because the Court found that the evidence showed that the officers believed Defendant was "not residing at his registered address" in the Adel house, and instead, he was "found living with the mother of his child" at the Sparks house. (*Id.* at 8). Additionally, "law enforcement officers [had] noticed bullet holes in a maroon Impala" at the Sparks house, and "through the collective knowledge of law enforcement," Defendant was suspected of being involved in a shooting in Valdosta in December of 2017,

1

and had been validated by the Georgia Department of Corrections as being a member of a gang. (*Id.*) In sum, the Court determined that these information gave the officers reasonable suspicion that Defendant was or had been involved in criminal activity or that he was possibly violating his probation terms when he was not found in the Adel house. (*Id.* at 9).

Thereafter, Defendant filed a Motion to Dismiss the Indictment pursuant to a violation of the Speedy Trial Act. (First Palmore Case, Doc. 46). The Government filed its Response (First Palmore Case, Doc. 47), and the Court held a hearing on Defendant's Motion on January 6, 2023. Thereafter, the Court dismissed Defendant Palmore's indictment without prejudice in the First Palmore Case. (First Palmore Case, Doc. 49).

## II. Indictment of Defendant Palmore in the Instant Case

On January 11, 2023, Defendant Palmore was re-indicted in the above-styled case and was charged with one count of Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. 922(g)(1) and 924(a)(1). (Doc. 1). The Indictment (Doc. 1) provides that on or about May 17, 2018, in the Valdosta division, Defendant, knowing that he had been convicted of a crime punishable by imprisonment for a term exceeding one (1) year, did knowingly possess a firearm, which had been shipped and transported in interstate and foreign commerce. (*Id.*)

Subsequently, Defendant was arraigned before United States Magistrate Judge Thomas Q. Langstaff on January 24, 2023. (Doc. 8, *text entry only*). Defendant entered a plea of not guilty (Doc. 11) and was released on a $10,000 unsecured bond, subject to conditions of release. (Doc. 12; Doc 13). Defendant also filed his request for discovery that same day. (Doc. 15).

Defendant filed the instant Motion to Suppress (Doc. 21) on February 21, 2023. Thereafter, the Government filed its Response (Doc. 28) in opposition. The Court held a hearing on Defendant's instant Motion on May 24, 2023. (Docs. 43; 49). Both Parties stipulated that additional evidence from the hearing be incorporated with the records already established in the First Palmore Case. (Doc. 49, at 5–6).

Present at the May 24th hearing for Defendant's instant Motion to Suppress (Doc. 21) were Defendant Palmore, Defense Counsel, the Government, and two witnesses—Ms. Catherine Watson with Department of Community Supervision ("DCS") and Agent Thomas

2

Clark with the Federal Bureau of Investigation. At the conclusion of the Parties' presentations, the Court instructed both Parties to file their post-hearing briefs after the hearing transcript became available on the record. (Doc. 42).

The transcript became available on June 23, 2023. (Doc. 49). Defendant timely filed his Post-Hearing Brief (Doc. 51) on July 14, 2023. The Government did not file a post-hearing brief.

At the hearing, Ms. Watson testified that Defendant Palmore was on unsupervised probation at the time of the search of the Sparks residence, which meant that Defendant did not have to seek permission to leave the state of Georgia, to go on vacation, or to spend the night in someone else's residence. (Doc. 49, at 8–18). She also testified that Defendant would only need to notify the officers if he moved to a new residence within Albany, Georgia, or was arrested. (Doc. 49, at 8–12).

Following Ms. Watson, Agent Clark testified at the hearing. He testified that prior to the search of the Sparks house, the information that the officers had on Defendant was that he was under supervision and on probation, was affiliated with a gang, was a convicted felon, and was potentially involved in a prior shooting in Valdosta that occurred in December of 2017. (Doc. 49, at 33–35, 66, 73). Defendant was not charged for or prosecuted for the December 2017 shooting, and Agent Clark stated that the officers only knew the "generalities" of that shooting and did not know if Defendant was a victim or the aggressor in that shooting. (*Id.* at 41–44, 71–73). Agent Clark also testified that the goal of the operation on May 17, 2018, was to assist DCS with its list of individuals whom DCS wanted to contact, and the list comprised of people who were on supervision and/or if there were active warrants. (*Id.* at 53–54, 58). Agent Thomas further testified that when the officers could not make contact with Defendant at the Adel house, they went to the Sparks house where they noticed the maroon Impala with bullet holes on the side. (*Id.* at 68). Additionally, Agent Thomas testified that it was his "understanding" that the officers had "reasonable suspicion" to search the Sparks house. (*Id.* at 74).

## **FACTS & BACKGROUND**

Defendant Palmore's charge arises from a joint law enforcement operation that was conducted in Cook County, Georgia, on May 17, 2018. (Docs. 21; 28). The operation was

3

led by Georgia Department of Community Supervision (DCS) and some personnel from Cook County Sheriff's Office, with the assistance of the FBI. (Docs. 21; 28; 49, at 59; 51). The goal of the operation was to make contact with subjects, who were on probation, affiliated with gangs, and/or if there were active warrants. (Doc. 49, at 53–54). DCS created the list of individuals to contact. (*Id.*) Sometime in April and early May of 2018, before the search on May 17, 2018, law enforcement officers had "roundtable" discussions to confer about the list of names that was put together by DCS. (Doc. 49, at 65). Defendant Palmore's name was on DCS's list because he was on "active probation," associated with a gang, and had been involved in a shooting in December of 2017, although the officers did not know whether Defendant was a victim or the aggressor in that shooting. (Doc. 49, at 34, 58, 71, 73, 78, 84); (Doc. 28, at 1); (Doc. 51, at 3–4). Defendant was not charged with anything related to or pursuant to that shooting. (Doc. 49, at 41–42).

At the time of the search of the Sparks house on May 17, 2018, Defendant was on probation with a Fourth Amendment waiver.[1] (Doc. 28, at 2–3); (Doc. 51, at 2); (First Palmore Case, Government's Exhibit 4, Defendant Palmore's Cook County Probation No. 13-Cr-121).[2]

On the day of the search, the officers had two possible addresses for Defendant Palmore: (1) 1503 Washington Post Road, Adel, GA ("Adel house"); and (2) 123 Washington Street, Sparks, GA ("Sparks house"). (Docs. 21; 28). The officers went to the Adel house first because it was the registered address for Defendant; however, they could not locate him there. (Docs. 21; 28). Thereafter, the officers headed over to the Sparks house. (Docs. 21; 28). Upon arrival, the officers noticed a maroon Impala with bullet holes on the side of the vehicle parked outside of the Sparks house. (Doc. 49, at 23–24, 63). The

---

[1] There is no dispute as to the validity of the Fourth Amendment waiver, which was one of Defendant Palmore's conditions of probation. Furthermore, no Party disputes Defendant's standing to contest the search of the Sparks house.

[2] At the motion to suppress hearing in the First Palmore Case, the Government introduced into evidence Defendant's current probation sentence No. 13-CR-121, which is a 10-year probation sentence from the Superior Court of cook County, entered on November 27, 2013, for one count of serious injury by vehicle. (First Palmore Case, Doc. 27, at 12). The current probation sentence was what the officers used to conduct the search of the Sparks house on May 17, 2018, and it was tendered into evidence without objection. (First Palmore Case, Doc. 33, at 6).

officers proceeded to knock on the door, and Defendant and a woman named Auriel Holton answered. (Doc. 21; 28). The officers notified both Defendant and Ms. Holton that Defendant had a Fourth Amendment waiver as part of his probation conditions, and then proceeded to search the premises. (Doc. 21).

During the search, the officers found Defendant's clothes and mail in that house. (*Id.*) They also found a DMPS, A-15 rifle inside a tent bag underneath the home. (Docs. 21; 28.) The officers also found AT&T bills directed to Defendant with the Sparks address while other various bills were addressed to Defendant using the Adel address. (Doc. 49, at 26–33). According to the Cook County Sheriff's Office Incident Report (Doc. 28-2), a check of the gun revealed it to be a stolen weapon. (*Id.*) That incident report further provides that in the master bedroom, the officers also found six (6) pages of "gang knowledge" sheets. (*Id.*) Defendant was arrested upon the discovery of the firearm. (Docs. 21; 28).

At the Motion to Suppress hearing on May 24, 2023, Ms. Watson, who is Defendant's community supervision officer with DCS, testified that Defendant did not have to ask for permission to leave the State of Georgia or to stay over at another residence under his probation terms. (Doc. 49, at 12). Defendant would only need to notify DCS about his address if he moved. (*Id.*) No evidence was produced that Defendant had moved or that he provided notice of moving to his probation officer.

In his briefs (Docs. 21; 51), Defendant argues that the officers lacked consent to search the Sparks house and that the officers did not have reasonable suspicion to search the house. The Government has not provided additional arguments or evidence as to Defendant's argument about consent. In the First Palmore Case, the Court ruled that the Government had failed to prove that the officers obtained consent to search the house. (First Palmore Case, Doc. 33, at 8) ("[T]he Court finds the Government failed to prove that officers actually obtained consent from Defendant or Ms. Holton to search the Sparks house.") Therefore, the only issue in this case is whether the officers had reasonable suspicion to search the Sparks house.

5

## **LEGAL STANDARD**

The Fourth Amendment provides individuals with the right to be secure in their person, home, papers, and effects against unreasonable searches and seizures and provides that warrants may only be issued for probable cause. U.S. Const. amend. IV. There are exceptions to the warrant requirement, such as consent to search or when some "special needs" make the "warrant and probable-cause requirement impracticable." *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991) ("A search conducted pursuant to a consent is a recognized exception to the requirements of probable cause and search warrant.") *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). One of those "special needs" is a "State's operation of a probation system." *Id.*

Although a probationer's home is protected by the Fourth Amendment, a probationer does not enjoy the same amount of liberty as other citizens. *United States v. Knights*, 534 U.S. 112, 120 (2001). "A probationer's expectation of privacy is reduced when he is subject to a probation condition requiring him to answer all inquiries made by his probation officer and requiring him to submit to home visits by his probation officer." *United States v. Collins*, 683 F. App'x 776, 778 (11th Cir. 2017). "[I]t must be remembered that the very assumption of the institution of probation is that the probationer is more likely than the ordinary citizen to violate the law." *Id.* (citing *Knights*, 534 U.S. at 120).

Still, a reasonable suspicion of criminal conduct is necessary for officers to conduct warrantless searches of a probationer's home when there is an absence of such condition. *United States v. Riley*, 706 F. App'x 956, 960 (11th Cir. 2017) (citing *United States v. Yuknavich*, 419 F.3d 1302, 1309–11 (11th Cir. 2005)); *United States v. Carter*, 566 F.3d 970, 974–75 (11th Cir. 2009). In other words, officers can still search a probationer's home if they have reasonable suspicion to do so. *Riley*, 706 F. App'x at 960. "Reasonable suspicion" consists of a sufficiently high probability that criminal conduct is occurring, which makes the intrusion on an individual's privacy interests reasonable. *Yuknavich*, 419 F.3d at 1311. To determine whether officers had reasonable suspicion, courts often assess the totality of the circumstances of each case to see if the searching officer had a "particularized and objective basis for suspecting legal wrongdoing." *Id.* In other words, unparticularized suspicion or mere hunch of criminal activity is not enough to satisfy the minimum level of objectivity that

is required to find "reasonable suspicion." *Id.* Officers must be able to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion. *Id.* (finding officers had reasonable suspicion to search because the facts showed that officers knew about the probationer's prior convictions, knew that the probationer was on probation, the probationer had opened the door ten minutes late but those ten minutes were not spent getting dressed because the probationer was shirtless, and the probationer acted nervous); *see also United States v. White*, 593 F.3d 1199, 1203 (11th Cir. 2010). Although reasonable suspicion must be more than "an inchoate and unparticularized suspicion or hunch," it is, nevertheless, "less demanding" than probable cause and requires a showing that is "considerably less than preponderance of the evidence." *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004); *Jackson v. Sauls*, 206 F.3d 1156, 1156 (11th Cir. 2000).

A court's rulings on motions to suppress involve mixed questions of fact and law. *Collins*, 683 F. App'x at 778. The Eleventh Circuit reviews a district court's factual findings for clear error while reviewing its application of the law to the fact de novo. *Id.* In doing so, the Eleventh Circuit construes the facts in light most favorable to the party that prevailed in the district court. *Id.*

## DISCUSSION

Defendant argues that the officers lacked reasonable suspicion to conduct a warrantless search of the Sparks residence. (Doc. 51, at 7). Defendant contends that his affiliation with gang members "does not rise to the level of reasonable suspicion to conduct a search pursuant to his probation Fourth Amendment waiver." (*Id.* at 8). Defendant points to Agent Ryan Smith's testimony from the August 31, 2022 hearing, in the First Palmore Case, where Agent Smith testified that he "had no personal knowledge of [Defendant] committing any new offenses." (*Id.*) Defendant further argues that law enforcement officers from various federal and state agencies conducted "compliance checks" on probationers and that the officers' knowledge of his gang affiliation is "dubious" because Agent Smith previously testified that information came from the Department of Corrections, even though the record does not show that Defendant had ever been to the Department of Corrections. (*Id.* at 9). Defendant contends that the "collective knowledge" of law enforcement regarding

7

the shooting that occurred in December of 2017—which is about five (5) months before the search on May 17, 2018—does not constitute reasonable suspicion to search Defendant's residence. (*Id.* at 11–13).

The Government contends that the officers' search of "Defendant's residence was part of an operation to make contact with probationers who were known gang members or affiliated with gangs." (Doc. 28, at 3). It also argues that the officers searched the residence at the request of DCS, which the special condition of Defendant's probation "specifically state" that the officers are allowed to do. (*Id.*)

Upon careful and full review of both Parties' briefs (Docs. 21; 28; 51), relevant record and evidence from the First Palmore Case and the instant matter, the Court finds that the officers had reasonable suspicion to search the Sparks residence. The totality of the circumstances shows that the search of the Sparks house was supported by reasonable suspicion.

To begin, the officers went to the Sparks house once they could not make contact with Defendant at the Adel house, which was his registered address. (Doc. 49, at 73). The officers' "goal" in visiting the Sparks house was to assist DCS to make contact with Defendant as part of his probationary requirement, not necessarily or not because Defendant had to be at the Adel house in the early morning of May 17, 2018. (*Id.*) Thus, when the officers could not make contact with Defendant in Adel, they subsequently went to the Sparks house to make contact with Defendant.

In addition, prior to and at the time of the search, the officers had a general knowledge that Defendant had been involved in a shooting that occurred in December of 2017. Defendant contends that the officers did not know whether he was the victim or an aggressor in that shooting and that, if anything, he was the victim in that shooting. (Docs. 51, at 4, 10; 49, at 34–41). The Court, however, finds that the officers did not need to possess such specific knowledge because the officers had other information that ultimately gave rise to reasonable suspicion. For instance, the officers also knew, prior to and at the time of the search, that Defendant was under supervision, affiliated with a gang, and was a convicted felon. When the officers pulled up to the Sparks house, they observed the maroon Impala with bullet holes on its side, which "matched the description" of the vehicle from the

8

December 2017 shooting.[3] (*Id.* at 23–24; 33). In light of the information that the officers had at the time of the search, along with their observation of the maroon Impala with bullet holes parked at the Sparks residence, the Court finds that the officers had reasonable suspicion. The Court further finds that the officers had a "particularized and objective" reason to sufficiently and reasonably suspect, in accordance with the information they had at the time of the search, that Defendant was engaging in misconduct or violating his probation conditions or the law, which ultimately justified the search of the Sparks house. *See United states v. Wasser*, 586 F. App'x 501, 505 (11th Cir. 2014) (finding that the officers had reasonable suspicion to search probationer's home because they were aware of the probationer's prior charge, his involvement with a gang, and presence of weapons in plain view at the time they searched his residence).

## CONCLUSION

For the aforementioned reasons, Defendant Motion to Suppress (Doc. 21) is **DENIED**.

**SO ORDERED**, this  6th   day of October 2023.

/s/ W. Louis Sands
W. LOUIS SANDS, SR. JUDGE
UNITED STATES DISTRICT COURT

---

[3] **Government:** And then when you approached the [Sparks] residence or when you saw the car, what did you find?
   **Clark:** . . . we had found the vehicle that matched the description with the bullet holes in the side of it.
 **Government:** And did that heighten your suspicion about whether or not he had been engaged or was engaged in criminal activity?
   **Clark:** Generally, you don't get—I mean, he's in some type of activity, yes, absolutely. Based upon what we knew, all I knew was that he was involved in a shooting . . .
(Doc. 49, at 71–72).